IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

TIPTON SHOLES, M.D.,

    Plaintiff,

      v.

BOARD OF REGENTS OF THE
UNIVERSITY SYSTEM OF GEORGIA
d/b/a AUGUSTA UNIVERSITY,

    Defendant.

          CV 119-022

---

## O R D E R

---

Presently pending before the Court are Defendant's motion to exclude (Doc. 82) and Defendant's motion for summary judgment (Doc. 83). For the following reasons, Defendant's motion to exclude is **GRANTED IN PART** and **DENIED IN PART** and Defendant's motion for summary judgment is **GRANTED**.

## I. BACKGROUND

Plaintiff originally filed suit on February 13, 2019. (Doc. 1.) He then amended his complaint twice, and the operative Amended Complaint was filed March 2, 2021 (Am. Compl., Doc. 50). The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 & 1391. (Id. at 2-3.)

Plaintiff was a resident in the Anesthesiology and Perioperative Medicine Department's (the "Department") residency

program at Augusta University's ("AU") Medical College of Georgia ("MCG") from July 1, 2016 until June 30, 2018. (Doc. 83-2, at 1.)[1]   Dr. Stephen Meiler is the Chairman of the Department at MCG, and Dr. Mary Arthur is the residency program director for the Department and serves as the point of contact for residents. (Id. at 2.)  MCG's residency programs all differ in their requirements and criteria for selecting residents. (Id.)  The Anesthesiology program typically takes three years to complete, not including an internship year. (Id.)  The educational and training aspects of the program are overseen by the American Board of Anesthesiology ("ABA") and the Accreditation Council for Graduate Medical Education ("ACGME"). (Id.)

The Anesthesiology program has a defined academic schedule, and residents are expected to attend at least eighty percent of all scheduled didactic sessions, including lectures, simulation training, problem-based learning, and anything else educational. (Id. at 3.)  If residents do not satisfy this attendance requirement, they receive an "unsatisfactory" in the core competency of professionalism reported to the ABA. (Id.)

---

[1] The Court notes that the majority of facts making up the Background section of this Order are based on Defendant's statement of material facts (Doc. 83-2) and Plaintiff's response thereto (Doc. 89-3).  Plaintiff additionally filed a 280-paragraph statement of "additional material facts" with his response to the motion for summary judgment (Doc. 89-2); however, the Court finds many to be redundant, unnecessary, and ultimately argumentative, and therefore omits many of Plaintiff's additional assertions.

During their operating room work, which is a large component of the residency program, residents receive input from multiple data sources and must be able to quickly synthesize the data and act swiftly to intervene. (Id. at 4.)

First year residents are expected to arrive at work no later than 6:30 each morning, have their operating room set up, and have completed interviewing their patients by 7:00 A.M. (Id. at 5.)   Residents are instructed from the start of residency how important it is to be on time at the beginning of their shifts and when returning from breaks.   (Id.)   Being on time to set up a room is more critical for residents because they are unlikely to anticipate many contingencies that could arise as they have not yet been exposed to enough situations to foresee all possibilities.   (Id. at 7.)   There is a difference between being an anesthesiologist and an anesthesiology resident.   (Id. at 9.)   All MCG anesthesiology residents work in a hospital setting for the majority of their training while not all will end up working in a hospital after; however, the purpose of the residency program is to train residents to serve the anesthesiology profession is all customary ways.   (Id.)

As residents progress, they are expected to show increasing levels of competency and autonomy to ensure they are ready for independent practice at the culmination of training.   (Id. at 11.)   Residents are evaluated by the faculty, mid-level

providers, and senior residents and are supposed to receive immediate verbal and written feedback from the Department. (Id. at 12; Doc. 89-3, at 22.)   Eventually, a resident's evaluations are compiled and given to the Clinical Competency Committee ("CCC"), which meets every six months to evaluate whether residents are satisfactorily progressing. (Doc. 83-2, at 12.) The CCC shares its evaluations with the ABA, and when a resident receives an unsatisfactory grade on an ABA six-month report, the resident is place on remediation. (Id. at 12-13.)   If a resident receives two consecutive unsatisfactory reports, the ABA requires the resident extend his or her training beyond the three-year standard timeline by at least six months. (Id. at 13.)   A resident's performance is viewed as a whole, not as single isolated events; in fact, most residents have at least some complaints during their residency but are allowed an opportunity to correct the issues. (Id.)

At the beginning of Plaintiff's residency, Dr. Arthur was contacted by some faculty and senior residents regarding Plaintiff's performance. (Id.; Doc. 89-3, at 24.)   In July 2016, Dr. Arthur and the chief resident met with Plaintiff to discuss his performance, including using his cell phone during a case and his timeliness. (Doc. 83-2, at 14; Doc. 89-3, at 25; Doc. 80, at 98-101.)   In the meeting, the Department's expectations for first year residents, including preparing the

4

night before and the importance of starting cases on time, were reviewed with Plaintiff. (Doc. 83-2, at 14.) In November 2016, Plaintiff again met with Dr. Arthur to discuss his performance, and they implemented a plan for him to complete daily time logs. (Id.; Doc. 89-3, at 26.) Nevertheless, the Department continued to receive complaints about Plaintiff and he continued to miss didactic sessions, despite his required attendance. (Doc. 83-2, at 15; Doc. 89-3, at 27.) As a result, Plaintiff was given an overall clinical competence grade of unsatisfactory for the period running from July 1, 2016 through December 31, 2016, and this was submitted to the ABA. (Doc. 83-2, at 15.) The report stated Plaintiff was unsatisfactory in the areas of: "demonstrates honesty, integrity, reliability, and responsibility," "learns from experience, knows limits," and "reacts to stressful situations in an appropriate manner." (Id.; Doc. 89-3, at 28.) The ABA report further stated: "there has been an issue of continued tardiness, lack of engagement during this 6 months [sic] period. This impacts his peers and faculty alike. His lack of situational awareness, preparedness and an unwillingness to follow directions is an ongoing problem." (Doc. 83-2, at 15; Doc. 89-3, at 28-29.)

In January 2017, Plaintiff took the Anesthesiology Knowledge Test and only scored in the first percentile nationally. (Doc. 83-2, at 16.) During a March 2017 emergency

5

CCC meeting, the CCC decided to place Plaintiff on a 90-day remediation plan. (Id.) The CCC decision noted Plaintiff "seems to be disconnected, apathetic, not focused on the big picture when it comes to patient care in the [operating room] and lacks critical thinking skills." (Id. at 17; Doc. 89-3, at 31.) The CCC presented him with his remediation plan on March 15, 2017. (Doc. 83-2, at 17.) The plan included the following terms: "Plaintiff was not allowed to be left alone with a patient, was required to be paired with a senior resident, was required to remain on the general [operating room] rotations and not allowed to move forward with specialty rotations, and was 'not allowed to take overnight or weekend calls for the time being for patient safety.'" (Id.) The remediation plan also required: daily electronic evaluations from each faculty member Plaintiff worked with in the general operating room, weekly mandatory meetings with his faculty mentor to discuss his daily evaluations and progress, close supervision by faculty assigned to his operating room, a requirement Plaintiff discuss all patient care decisions and management plans with the attending physician on service, completion of various reading assignments and essays on professionalism, staying compliant with all administrative duties (including documenting duty hours and keeping case logs current), and attending on-campus courses for "Self-Managing Time and Productivity" and "If Disney Ran Your

Hospital." (Id. at 17-18.) As part of remediation, Plaintiff was warned that if patient safety was ever compromised under his care, he could be removed from clinical duties, and if another serious complaint was lodged against him by a Department member or a patient, it would be referred to the Department Chair and would constitute possible grounds for program dismissal. (Id. at 18.) Further, Plaintiff was warned that after the three-month remediation, if there was a lack of improvement or insufficient improvement in his performance, remediation would be discontinued, and the Department's only alternative would be to proceed with formal disciplinary action that could result in his termination or non-renewal of his residency contract. (Id.) Plaintiff was also referred to Dr. James Foster for a fitness for duty evaluation, and Dr. Foster reported he saw no evidence of significant issues and predicted future excellent performance by Plaintiff. (Id. at 18-19.)

Plaintiff's wife scheduled further evaluations and he was seen by Dr. Vaughn McCall, a practicing psychiatrist at AU and an Executive Dean of MCG, who ultimately diagnosed Plaintiff with narcolepsy in April 2017. (Id. at 19; Doc. 89-2, at 10.) Prior to this diagnosis, Plaintiff never considered he had narcolepsy, despite having interesting sleep patterns most of his life. (Doc. 83-2, at 19.) Plaintiff informed the Department of his narcolepsy diagnosis, and after meeting with

Dr. Arthur, Dr. Meiler, and Dr. Walter Moore on May 5, 2017, they made the group decision to place Plaintiff on a 90-day medical leave of absence so he could have time to regulate his medications before returning to residency.   (Id. at 19-20.) Plaintiff agreed during the meeting to sign a release for Dr. McCall to be permitted to speak with Dr. Arthur, Dr. Meiler, and Dr. Moore about his diagnosis; however, the release was not actually signed until June 29, 2017.  (Id. at 20; Doc. 89-3, at 36.)   Dr. McCall continued to treat Plaintiff while on medical leave and on July 17, 2017 Plaintiff informed Dr. Meiler and Dr. Arthur that he was cleared to return to the Department with no restrictions effective August 1, 2017.   (Doc. 83-2, at 20.)   He also informed Dr. Meiler and Dr. Arthur he would not require or request any schedule or work accommodations, and that medication is his only accommodation.  (Id.)   Dr. Arthur emailed Dr. McCall for clarification, and Dr. McCall informed her and Dr. Meiler that he had not cleared Plaintiff to return to work.   (Id. at 21.)   The doctors researched and could not find medical literature discussing doctors with narcolepsy, or whether such diagnosis affected an anesthesiologist or anesthesiology resident.  (Id.)   Dr. McCall could not say with a reasonable degree of certainty whether Plaintiff would be able to function as an independent anesthesia provider during nighttime hours. (Id.; Doc. 89-3, at 38.)

Around that time, the Department planned to inform Plaintiff his residency contract would not be renewed past June 30, 2018. (Doc. 83-2, at 22.)   However, Glenn Powell, AU Director of Employment Equity, was made aware of the Department's plan to non-renew Plaintiff's contract and told the Department to wait to finalize the decision until further discussions were had, including possible accommodations for Plaintiff and guidance for the Department. (Id.)   Dr. Arthur emailed Plaintiff and requested he meet with Mr. Powell to determine what accommodations he needed. (Id.)   Plaintiff alleges that during his meeting with Mr. Powell he requested that if he were on overnight call the night before a lecture, he be permitted to take a 20-minute nap during the first part of lecture; however, Defendant argues they never received accommodation requests or a transfer request. (Id.; Doc. 89-3, at 40.)   Nevertheless, the Department never made any accommodation as Plaintiff states he wanted. (Doc. 89-3, at 40.)

On September 1, 2017, Plaintiff returned to residency from his medical leave and was given a contract that only lasted until February 2018 instead of June 30, 2018. (Doc. 83-2, at 24.)   Plaintiff disputes this was unintentional, however, he later signed a revised contract that ran through June 30, 2018. (Id.; Doc. 89-3, at 45.)   Defendant intended Plaintiff to still

be on the remediation plan upon his return; however, Plaintiff disputes he was ever informed that he was still on remediation. (Doc. 83-2, at 24; Doc. 89-3, at 46.)  Nevertheless, Plaintiff was not permitted to work on certain rotations or take night call.  (Doc. 83-2, at 25.)  Between his return in September 2017 and the end of January 2018, Dr. Arthur continued to get reports that Plaintiff was late for his shifts; however, Plaintiff disputes the number of times he was late.  (Id.; Doc. 89-3, at 47.)  Often times, the reason for Plaintiff being late was due to his oversleeping.  (Doc. 89-3, at 48.)  Defendant contends that the Department had a contingency plan in place for when Plaintiff was scheduled due to his unreliability.  (Doc. 83-2 at 26.)  Plaintiff's next performance report stated:

> he "need[ed] to be more prepared and on time for his cases [and that] he does not demonstrate readiness to progress from a CA1 to a CA2," was "missing the basic concepts of anesthesia such as managing the airway, or managing the vital signs," "has not shown the ability to think critically on his own," "has trouble following directions and does not seem to ask relevant perioperative questions that influence patient management," "fail[s] to understand the need for urgency in some situations," "appears as an unreliable team player," "needs to work[] on improving his skills, preparedness and attentiveness.. [and] needs to be more organized and aware of critical events that can happen in the operating room . . . [a]lthough he listens when you speak he seems like he is in his own world. He needs to get better at applying what he learns and to learn from his mistakes and especially know when to ask for help."

(Id.)   Plaintiff admits this language was in his report but disputes the characterization of his performance.   (Doc. 89-3, at 49.)

At Mr. Powell's request, Dr. Arthur created a list of essential functions of an anesthesiology resident based on the ABA and ACGME.   (Doc. 83-2, at 27.)   Among the essential functions she compiled were: arriving on time, as well as an outline of on call activities, including taking call for a 24-hour period.   (Id.)   Dr. McCall was provided with the list of essential functions and the summary evaluation report Dr. Arthur created to document the Department's issues and concerns with Plaintiff.   (Id. at 27-28.)   Although Dr. McCall originally certified Plaintiff was capable of performing everything on the essential functions checklist, he ultimately withdrew his signature from the certification after reviewing the summary evaluation report.   (Id. at 27-28; Doc. 89-3, at 51-52.)

A CCC meeting was held February 1, 2018 to vote on whether to renew Plaintiff's residency contract for the July 2018 academic year based on the performance evaluations received. (Doc. 83-2, at 28.)   Of the seven members who were part of the CCC, six voted to non-renew and one abstained.   (Id.)   The meeting notes state: Plaintiff has not reached out to the Employment Equity office to request accommodations for his condition; the committee would like to investigate the

11

possibility of extending Plaintiff through June to give him time to accept and find a new direction for his career; Dr. Arthur will contact the Graduate Medical Education office and legal department regarding possible transition options for Plaintiff; Reaching out to AU's career counseling office was suggested and will be explored. (Doc. 74-47.) There are continuing debates about whether Plaintiff explicitly requested a transfer to the internal medicine residency program. (Doc. 89-3, at 40-41.) However, the Parties agree that for a resident to transfer internally to another MCG program, the new residency program must agree to accept the transfer – other residency programs have no power or authority to force a different program to accept a resident transfer. (Doc. 83-2, at 23.) Dr. Meiler, as chairman of the Department, ultimately makes the decision on whether to non-renew a resident's contract, and he agreed with the CCC recommendation not to renew Plaintiff's contract for the July 2018 academic year. (Id. at 28.)

On February 19, 2018, Plaintiff was informed that based on the CCC's recommendation, the Department would not be renewing his residency contract for the year beginning July 1, 2018, and his last working day would be June 30, 2018. (Id. at 30.) Plaintiff did not appeal this decision. (Id.) In May 2018, Plaintiff came to Dr. Arthur to generally ask about accommodations and a transfer – he admits this is the first time

he asked about being transferred but also disputes the fact at the same time. (Id. at 31; Doc. 89-3, at 57-58.) Plaintiff stated in his deposition that the first time he brought up the possibility of being transferred to another residency program was only after his contract was non-renewed; however, he also asserts he disputes that the first time it was brought up to Dr. Arthur was May 2018. (See Doc. 89-3, at 57-58.) Nevertheless, Plaintiff was not transferred into another residency program.

Plaintiff brings claims against Defendant, alleging violations of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, et seq., as amended, (the "Rehab Act") for disability discrimination based on his narcolepsy diagnosis, and Defendant's alleged failure to accommodate his disability. (Doc. 50, at 10-12.) Specifically, Plaintiff alleges Defendant discriminated against him by terminating his employment and not renewing his contract due to his disability. (Id. at 11.) Furthermore, he alleges Defendant discriminated against him by subjecting him to different terms and conditions of employment during his employment. (Id.) Plaintiff alleges the final acts of discrimination were that Defendant did not allow him to continue in any anesthesiology or residency programs and refused to accommodate him for a transfer to another program. (Id. at 12.) Defendant moves for summary judgment on Plaintiff's claims, arguing Plaintiff did not meet the requirements of a

qualified individual for his position, he cannot show any similarly situated, non-disabled resident that was treated better than him or that actions were taken against him due to his disability, all actions taken against Plaintiff were based on legitimate, non-discriminatory reasons, and his failure to accommodate claim fails because he cannot show he ever requested an accommodation, and any request he made was after his contract was non-renewed, and was unreasonable, untimely, and would have altered the residency or created an undue hardship for the Department. (Doc. 83-1, at 2.)

## II. MOTION TO EXCLUDE

Defendant moves, pursuant to Federal Rules of Evidence 402, 403, 702, and 703, to exclude the testimony of Dr. David Alexander Schulman. (Doc. 82.) Plaintiff responded in opposition to Defendant's motion (Doc. 88), Defendant replied in support (Doc. 97), and Plaintiff filed a sur-reply (Doc. 100). The Court addresses the Parties' arguments below.

### A. Background

Dr. Schulman filed an expert report and a supplement to his expert report on behalf of Plaintiff. (Doc. 82-1.) He has a Medical Doctorate from Johns Hopkins University and a Master's in Public Health from Boston University. (Id. at 1.) He is trained in internal medicine, pulmonary medicine, critical care medicine, and sleep medicine. (Id.) He is board certified in

the latter three and gave up his certification in internal medicine in 2018. (Id.)

Currently, Dr. Schulman is a professor of medicine at Emory University in Atlanta, Georgia. (Id.)  His practice consists entirely of sleep medicine, and he often manages patients with narcolepsy. (Id.)  From 2006 until 2020, he served as the director of Emory's fellowship training program in Pulmonary and Critical Care Medicine. (Id.)  Dr. Schulman's expert report offers background information on narcolepsy, its symptoms, and characteristics. (Id. at 4-5.)  He also provides examples of treatment of daytime sleepiness in narcolepsy. (Id. at 5-7.)

Dr. Schulman did not review Plaintiff's performance reports while preparing his expert report; however, he asserts that if Plaintiff's performance was affected by daytime sleepiness, there were additional methods of treatment to manage his symptoms. (Id. at 7.)  Specifically for Plaintiff, Dr. Schulman offers his opinion that he reported adequate control of his daytime sleepiness in 2017 and did not report symptoms of cataplexy; therefore, his narcolepsy diagnosis "should not have been a contraindication to his ongoing work as a resident in anesthesiology." (Id. at 8.)  He believes that upon returning from his leave of absence, Plaintiff did not report symptoms that would have limited his ability to work in the anesthesiology training program. (Id.)  Further, he is of the opinion that if Plaintiff's symptoms worsened, there were

additional treatment options that could have been considered. (Id.)

   In his supplemental opinion, Dr. Schulman provided additional opinions regarding Dr. McCall and his treatment of Plaintiff. (Id. at 9.) He notes he "was surprised that Dr. McCall did not suspect that narcolepsy could be a contributor to [Plaintiff's] repeatedly showing up late in the morning . . . as oversleeping is a common manifestation of narcolepsy." (Id.) Dr. Schulman also disagrees with Dr. McCall's assertion that Plaintiff was on the maximal therapy for his diagnosis and believes there were different formulations of drugs that could have monitored his symptoms. (Id.) He also opines that Dr. McCall's decision to withdraw his signature from the essential functions checklist without discussing with Plaintiff was due to the conflict between Dr. McCall's responsibility as an AU employee and as Plaintiff's treating physician. (Id. at 10.) In preparing his supplemental opinion, Dr. Schulman reviewed Dr. McCall's deposition, and Exhibits V and Y from Dr. McCall's deposition, which are minutes from a conference call about Dr. Sholes and a History and Physical Exam Report of Plaintiff performed by Dr. McCall. (See id. at 9; Docs. 75, 75-22, 75-25.)

   Defendant moves to exclude the testimony of Dr. Schulman. (Doc. 82.) Defendant specifically lists ten opinions to exclude; however, it later stated it actually moves to exclude

the entire opinion. (Id. at 2-4; Doc. 97.) The crux of Defendant's motion is that Dr. Schulman is not qualified, his opinions are not reliable, and his opinions are irrelevant. (Doc. 82, at 8-15.) Plaintiff opposes the motion, arguing Dr. Schulman is qualified, his opinions are reliable and relevant, and at a minimum he should be permitted to testify about the topics left unmentioned by Defendant's motion. (Doc. 88.)

## B. Legal Standard

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

"As the Supreme Court recognized in Daubert v. Merrell Dow Pharms., Inc., [509 U.S. 579, 589 (1993)], Rule 702 plainly contemplates that the district court will serve as a gatekeeper to the admission of [expert] testimony." Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1340 (11th Cir. 2003). "The burden of laying the proper foundation for the admission of

the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999).

The Eleventh Circuit has explained that district courts are to engage in a three-part inquiry to determine the admissibility of expert testimony under Rule 702. Quiet Tech., 326 F.3d at 1340. Specifically, the court must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Id. at 1340-41 (citations omitted).

First, an expert may be qualified to testify due to his knowledge, skill, experience, training, or education. Trilink Saw Chain, LLC v. Blount, Inc., 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008) (citation omitted). "A witness's qualifications must correspond to the subject matter of his proffered testimony." Anderson v. Columbia Cnty., No. CV 112-031, 2014 WL 8103792, at *7 (S.D. Ga. Mar. 31, 2014) (citing Jones v. Lincoln Elec. Co., 188 F.3d 709, 723 (7th Cir. 1999)). However, an expert's training need not be narrowly tailored to match the exact point

of dispute.   McDowell v. Brown, 392 F.3d 1283, 1297 (11th Cir. 2004).

Second, the testifying expert's opinions must be reliable. In Daubert, the Supreme Court directed district courts faced with the proffer of expert testimony to conduct a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. at 592-93.   There are four factors that courts should consider: (1) whether the theory or technique can be tested, (2) whether it has been subject to peer review, (3) whether the technique has a known or potential rate of error, and (4) whether the theory has attained general acceptance in the relevant community.   Id. at 593-94.   "These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion."   United States v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004) (citation omitted).   For example, experience-based experts need not satisfy the factors set forth in Daubert. See United States v. Valdes, 681 F. App'x 874, 881 (11th Cir. 2017) (affirming admission of testimony from expert identifying firearms based upon years of experience working with firearms). However, "[t]he inquiry is no less exacting where the expert

'witness is relying solely on experience' rather than scientific methodology." Summit at Paces, LLC v. RBC Bank, No. 1:09-cv-03504, 2012 WL 13076793, at *2 (N.D. Ga. May 22, 2012) (quoting FED. R. EVID. 702, advisory committee's notes to 2000 amendment)). Bearing in mind the diversity of expert testimony, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999). "[W]hether the proposed testimony is scientifically correct is not a consideration for this court, but only whether or not the expert's testimony, based on scientific principles and methodology, is reliable." In re Chantix Prods. Liab. Litig., 889 F. Supp. 2d 1272, 1280 (N.D. Ala. 2012) (citing Allison v. McGhan Med. Corp., 184 F.3d 1300, 1312 (11th Cir. 1999)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Id. (citations omitted and alterations adopted).

Regardless of the specific factors considered, "[p]roposed testimony must be supported by appropriate validation - i.e., 'good grounds,' based on what is known." Daubert, 509 U.S. at 590. In most cases, "[t]he expert's testimony must be grounded in an accepted body of learning or experience in the expert's

field, and the expert must explain how the conclusion is so grounded." FED. R. EVID. 702, advisory committee's notes to 2000 amendment. "Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough" to carry the proponent's burden. Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1113 (11th Cir. 2005). Thus, "if the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Frazier, 387 F.3d at 1261 (citation omitted) (alterations in original).

Third, expert testimony must assist the trier of fact to decide a fact at issue. The Supreme Court has described this test as one of "fit." Daubert, 509 U.S. at 591. To satisfy this requirement, the testimony must concern matters beyond the understanding of the average lay person and logically advance a material aspect of the proponent's case. Id.; Frazier, 387 F.3d at 1262. Yet, "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Frazier, 387 F.3d at 1262-63.

## C. Discussion

As a preliminary issue, Plaintiff argues that since Defendant's motion does not address all of the opinions in Dr. Schulman's report, the motion fails to provide a legal basis for exclusion of all of his opinions. (Doc. 88, at 1-2.) Defendant counterargues that it *has* moved to exclude all of Dr. Schulman's opinions and the opinions Plaintiff seeks to keep as valid were not in his expert reports and are not eligible for consideration. (Doc. 97, at 2.) In response, Plaintiff argues wholesale exclusion can constitute an abuse of discretion where portions of the testimony are reliable. (Doc. 100, at 2 (citing Sorrels v. NCL (Bahamas) Ltd., 796 F.3d 1275, 1281 (11th Cir. 2015).) Plaintiff argues opinions outside the expert report are allowed, and Defendant has not attacked Dr. Schulman's qualifications as an expert, so it has not provided a real explanation for excluding his opinions entirely. (Id. at 3.)

The Court agrees with Plaintiff and finds Defendant did not sufficiently provide argument to exclude Dr. Schulman entirely within the pending motion to exclude. However, the Court will address Defendant's arguments as to exclusion of the ten explicit opinions it references in its motion.[2] Defendant makes mention of trying to also exclude some of Dr. Schulman's deposition testimony; however, none of that testimony is directly cited in Defendant's motion to exclude and therefore it

---

[2] The Court refers to these 10 Opinions as Defendant labeled them in its motion to exclude. (See Doc. 82, at 2-4.)

is not properly before the Court at this time.  The Court does note that Federal Rule of Civil Procedure 26(a)(2)(B) requires expert reports contain "a complete statement of all opinions the witness will express and the basis and reasons for them."  FED. R. CIV. P. 26(a)(2)(B).  Therefore, any opinions Plaintiff seeks to offer from Dr. Schulman should have been included in his expert report or the supplement thereto, and his deposition testimony cannot be used except for providing additional information that relates to the opinions expressed in his filed report.  See Landivar v. Celebrity Cruises, Inc., 340 F.R.D. 192, 195 (S.D. Fla. 2022) (explaining that Rule 26 contemplates that an expert will supplement, elaborate upon, and explain his report through oral testimony).  Based on this, the Court is only examining the ten explicit opinions Defendant moves to exclude.  The ten relevant opinions are as follows:

> 1. As of the time of his return from his leave of absence, Dr. Sholes did not report symptoms of daytime sleepiness or cataplexy that would have limited his ability to work in the anesthesiology training program.
>
> 2. Had worsening symptoms of daytime sleepiness developed, there were additional treatment options that could have been considered.
>
> 3. Had symptoms of cataplexy developed, there were treatment options that could have been considered.
>
> 4. In reviewing these documents, I was surprised that Dr. McCall did not suspect that narcolepsy could be a contributor to Dr. Sholes' "repeatedly showing up late in the morning," as oversleeping is a common manifestation of narcolepsy.

5. I disagree with the assertion that "Tipton was on the maximal therapy for his diagnosis" in early 2018. At the time being referenced in this statement, Dr. Sholes was reportedly taking modafinil 200 mg twice per day, lisdexamfetamine (in the form of Vyvanse) 50 mg twice per day, and amphetamine / dextroamphetamine (in the form of Adderall) 20 mg once per day.

6. Had the decision been made that Dr. Sholes was not adequately treated on this regimen, I would agree that adding more amphetamine would not be appropriate (as he was already taking a dose that I would not recommend adding to), but transitioning to different formulations of each drug would have been possible. Examples would include substituting armodafinil for modafinil (some patients respond better to one drug than the other, though I have found it hard to predict which will work better for a given patient), transitioning from Vyvanse to Dexedrine, or tapering the Vyvanse or Adderall and adding on methylphenidate (Ritalin).

7. If a decision was made to avoid tapering one of the stimulants, consideration could still have been given to addition of either bupropion or clarithromycin. While both of these agents would have to be used as an "off-label" indication for narcolepsy, both have ovide benefit in some cases of patients with hypersomnia; though it is not guaranteed that they would have worked for Dr. Sholes, it would certainly have been appropriate to try one or both before concluding that no additional therapy would have been available. I agree with Dr. McCall that sodium oxybate would probably not be an agent I would offer in the absence of documented cataplexy.

8. I suspect that Dr. McCall's decision to withdraw his signature from the essential functions checklist without circling back to discuss the situation with Dr. Sholes was not made lightly, but I find there to be significant potential conflict between Dr. McCall's responsibility to his employer (August[a] University) and to his patient.

9. To withdraw [Dr. McCall's] signature without circling back with Dr. Sholes regarding his reported failure "to inform Dr. McCall of his continued

tardiness, extended lunch periods . . . and to consistently participate in didactics and required meetings" undoubtedly prevented Dr. McCall from exploring different pharmacologic or behavioral regimens with Dr. Sholes.

10. If Dr. Sholes' had previously provided unrestricted permission for Dr. McCall to communicate with training program leadership, that would mitigate my concerns to some degree, but I still believe it is in the best interests of the doctor-patient relationship to keep the patient apprised of what is being asked of his treating physician.

(Doc. 82, at 2-4 (citations omitted).)

### 1. Qualification

First, Defendant argues Dr. Schulman is not qualified to give Opinions 1-3 or 8-10 concerning whether Plaintiff had symptoms limiting his work ability or about potential conflicts Dr. McCall had when he told the Department Plaintiff was unable to perform the essential functions of residency. (Doc. 82, at 8-9.) Defendant argues that while Dr. Schulman specializes in sleep medicine, pulmonology, and critical care, he himself admits he is not an anesthesiologist and not an expert in anesthesia, so he cannot provide much in the way of what would be deemed competence in this area. (Id. at 9.) Defendant believes an expert "should not be allowed to opine on an anesthesiology resident's ability to perform his job when that expert is not even aware of what those job duties entail." (Id. at 10.) The Court finds it important to note that Defendant does not argue Dr. Schulman is unqualified as an expert in general, only that he is unqualified to offer these Opinions;

therefore, the Court will not analyze Dr. Schulman's qualifications as an expert generally because such position is not disputed.

In response, Plaintiff argues Opinion 1 does not qualify for exclusion under Daubert because it is not expert testimony. (Doc. 88, at 9.) As to Opinions 2-3 and 9, he argues Dr. Schulman is qualified to question Dr. McCall's treatment of Plaintiff because of his background and distinguished medical career. (Id. at 12-13.) And as to Opinions 8 and 10, Plaintiff argues Dr. Schulman is qualified based on his extensive training and experience as a physician, implying he possesses extensive expertise in medical ethics. (Id. at 15-16.)

As to Opinion 1, Plaintiff admits it is not expert testimony.[3] (See id. at 9.) Instead, he states this is simply Dr. Schulman's recitation of the factual record. (Id. at 10.) Subjective portrayals of factual information like this from an expert do not assist the jury. See Giusto v. Int'l Paper Co., No. 1:19-cv-0646, 2021 WL 3603374, at *4 (N.D. Ga. Aug. 31, 2021). "Given [Dr. Schulman's] qualifications and expert status, there is a greater risk of prejudice to [Defendant], as a jury may naturally afford his rendition of the facts

---

[3] In Plaintiff's reply brief in support of his opposition to Defendant's motion to exclude, he changes his argument and asserts Opinions 1 and 9 are both expert testimony and lay opinion testimony (Doc. 100, at 4-5); however, in his original opposition he argued Opinions 1 and 9 were "not expert testimony at all" (Doc. 88, at 11-12). However, the Court agrees with his original argument that the opinions are not expert opinions as they do not require "scientific, technical, or other specialized knowledge" and therefore could unduly prejudice the jury by affording more weight to his opinions as he is an expert.

heightened weight." Id. (citing Hendrix v. Evenflo Co., 255 F.R.D. 568, 579 (N.D. Fla. 2009) ("When the trier of fact is entirely capable of determining issues in the case without any technical assistance from . . . experts, expert testimony is unhelpful and must be excluded from the evidence. Otherwise, there is a risk the trier of fact will give the expert testimony undue weight on account of its special status.")). Based on this, Opinion 1 is excluded as it is not a permissible area in which Dr. Schulman may offer expert testimony.

As to Opinion 9, Plaintiff similarly argues the opinion is not expert testimony, but Dr. Schulman should be permitted to testify about this if he's allowed to testify at all. (Doc. 88, at 11-12.) Since Plaintiff admits this is lay opinion testimony, for the same reasons stated above for Opinion 1, the Court will not permit Dr. Schulman to offer this as it may improperly influence the jury; therefore, Opinion 9 is excluded.

As to Opinions 2-3, Plaintiff argues Dr. Schulman is qualified to render these opinions because he is a Professor of Sleep Medicine, ran Emory University's sleep lab for years, has successfully treated lots of patients with narcolepsy, has been published extensively on the disease, and is considered a leading expert on sleep disorders. (Doc. 88, at 13.) The Court finds Dr. Schulman's knowledge, skills, experience, training, and education qualifies him to opine on the fact there were additional treatment options that could have been considered for

Plaintiff.   See Trilink Saw Chain, 583 F. Supp. 2d at 1304 (citation omitted).   Defendant offers nothing to suggest Dr. Schulman is incapable of offering his knowledge of treatment options, therefore the Court finds he is qualified to offer Opinions 2 and 3.

As to Opinions 8 and 10, Dr. Schulman offers his opinion on Dr. McCall's decisions and interactions in the treatment of Plaintiff and how his ethics and the doctor-patient relationship played into his actions.   (Doc. 82-1, at 10.)   Defendant argues Dr. Schulman is not qualified "to opine on any possible conflict of interest that Dr. Vaughn McCall, as Plaintiff's treating physician, had when he communicated to the graduate medical office and anesthesiology department that Plaintiff was unable to perform the essential functions of an anesthesiology resident."   (Doc. 82, at 9.)   Further, it argues there is no evidence Dr. Schulman has any specialization or expertise in bioethics, medical conflicts of interest, or ethics generally, and he should not be allowed to offer his *ipse dixit* testimony that Plaintiff's treating physician had any conflict of interest in treating Plaintiff while being employed at AU.   (Id. at 10.) In response, Plaintiff argues "Dr. Schulman's extensive training and experience as a physician readily implies that he possesses extensive expertise in medical ethics so as to permit him to render an expert opinion on that topic."   (Doc. 88, at 16.)   He argues the Court "should consider a proposed expert's full range

of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." (Id. (quoting Smith v. Ford Motor Co., 215 F.3d 713, 718 (7th Cir. 2000).) Furthermore, he argues an expert does not have to have experience that mirrors the facts of the case in order to be qualified. (Id. (citation omitted).) In rebuttal, Defendant again argues that "Plaintiff has presented no authority to show that simply by virtue of being a doctor with extensive training and experience in one field of medicine, that this inherently makes him an expert as to all medical ethics issues arising in treated patients with that condition." (Doc. 97, at 4.) It argues again that Dr. Schulman is not an expert in bio-ethics or medical conflicts of interest, and therefore any testimony on these matters should be disregarded. (Id.) In response, Plaintiff begs the questions of "[w]hy expertise in bioethics, a term that refers to a field of study concerned with issues arising from biotechnology and medicine's role within society, would be required to render these opinions." (Doc. 100, at 4.) Further, he clarifies he "has not held Dr. Schulman out as an expert on 'all medical ethics issues' concerning persons with narcolepsy, just the variety of those that he offered in his report, which are the type that he (and nearly every medical doctor) confronts on a near daily basis and are of extremely limited complexity." (Id.) The Court finds Dr. Schulman, as a trained medical

professional, shall be permitted to offer his opinions on conflicts of interest and the doctor-patient relationship. By means of his education, background, and training, Dr. Schulman has knowledge beyond that of a general lay person as to how doctors handle ethical issues in their daily work. As explained above, an expert's training need not be narrowly tailored to match the exact area of dispute, consequently the Court does not find Dr. Schulman would have to be specifically trained in medical ethics to be qualified to offer these opinions. See McDowell, 392 F.2d at 1297. Based on these conclusions, the Court finds Dr. Schulman qualified to render Opinions 8 and 10.

### 2. Reliability

Next, Defendant argues Dr. Schulman's Opinions 1-7 are not reliable. (Doc. 82, at 10-13.) It asserts Opinions 1-3 were based solely on Plaintiff's self-reporting, and Dr. Schulman did not refer to or rely on any medical literature in rendering his opinions. (Id. at 10-11.) Further, it argues Dr. Schulman did not see Plaintiff's symptoms of sleepiness; therefore, he cannot comment on how Plaintiff's condition compared to others he had treated. (Id.) Defendant argues Dr. Schulman had no way to know whether Plaintiff's performance issues were actually a result of his narcolepsy or something else. (Id. at 12.) Furthermore, Defendant asserts Dr. Schulman is opining on various treatment options that could have been pursued; however,

he had no way to know if the treatments or medications would have actually worked. (Id. at 13.)

As to Opinions 2 and 3, Plaintiff argues Defendant's arguments are inapplicable, and it has not questioned Dr. Schulman's experience as applied to these opinions, nor suggested his methodology was flawed or that the opinions are based on insufficient facts or data. (Doc. 88, at 13.) Further, Plaintiff argues Dr. Schulman is not required to show to a degree of absolute certainty that alterative medications would have been effective, but he has gone through a great number of trial and errors over the years and has discovered effective approaches to treating narcolepsy. (Id. at 13-14.)

In Opinions 2 and 3, Dr. Schulman is simply offering his opinion that if Plaintiff's symptoms worsened or if he developed cataplexy, there were additional treatment options that could have been considered. (Doc. 82-1, at 8.) The Court finds these opinions to be reliable based on Dr. Schulman's years of experience in treating and studying narcolepsy patients. It is not necessary that Dr. Schulman provide research and reliable information to show that these alternative treatments would have worked since he is not stating that they would have been successful in treating Plaintiff. Instead, Dr. Schulman is simply stating alternative methods and medications exist to treat narcolepsy and they could have been tried. The Court finds this limited opinion sufficiently reliable.

As to Opinion 4, Defendant argues Dr. Schulman's opinion that he was surprised Dr. McCall did not suspect Plaintiff's narcolepsy was a contributing factor to him showing up late in the morning, as oversleeping is common in narcolepsy, is not reliable. (Doc. 82, at 12.) It asserts Dr. Schulman had no way to known whether Plaintiff's performance issues were a result of his narcolepsy or something else. (Id.) Further, it argues there is no evidence Dr. Schulman relied on or proffered to show Plaintiff's tardiness was a direct result of his narcolepsy. (Id.) In opposition, Plaintiff argues Opinion 4 is sufficiently reliable to warrant admission because Dr. Schulman has effectively treated numerous patients with hypersomnia over the course of his 20-year career, including patients with narcolepsy in "high-stress" fields; therefore, he is familiar with common symptoms of the disease and his opinion is reliable. (Doc. 88, at 10-11.) Furthermore, he argues that Defendant's mention of performance issues beyond tardiness are irrelevant because Opinion 4 only addresses tardiness. (Id. at 10.) Plaintiff believes Dr. Schulman's opinion is reliable because he is trusting straightforward, simplistic matters in his field, and his qualifications and experience support the reliability of his conclusions. (Id.)

The Court finds Opinion 4 to be reliable. Dr. Schulman is simply stating his opinion that narcolepsy *could* be a contribution to Dr. Sholes' excessive tardiness. (See Doc. 82-

1, at 9.)   Dr. Schulman is not offering an opinion that narcolepsy was in fact the cause of Plaintiff's tardiness, and the Court believes that opinion would be improper since he never met or studied Plaintiff firsthand.   However, simply offering the opinion that narcolepsy could cause Plaintiff to oversleep and arrive late to work in the mornings is reliable based on Dr. Schulman's experience and training.

For Opinions 5, 6, and 7, Dr. Schulman takes a little bit of a deeper dive into the specifics of Plaintiff's treatment and his disagreement with the statement that Plaintiff was on the "maximal therapy" for his diagnosis, his opinion that transitioning to other formulations of the prescribed medications would have been possible, and that had tapering been avoided, there were other medications that could have been given consideration in treating Plaintiff.   (Id.)   Defendant's arguments for exclusion of Opinions 5-7 mirror those for excluding Opinion 4.   (See Doc. 82, at 13.)   Essentially, Defendant argues Dr. Schulman had no way to know if his suggested treatments and medications would have worked for Plaintiff, there is no way to force a patient to change medications or undergo testing if the patient believes he is being adequately treated, and there is no clear evidence that Dr. Schulman relied on or proffered to show Plaintiff would have agreed to new treatments, or that any alternative treatment would have corrected Plaintiff's symptoms and enabled him to

33

perform the essential functions of his residency. (Id.) In response, Plaintiff argues Dr. Schulman is not required to show alternative medication regimes would have been effective, and he has been through a great number of trials and errors over the years discovering what are and what are not effective approaches to treating narcolepsy in various patients. (Doc. 88, at 13-14.) Therefore, Plaintiff argues, Dr. Schulman's opinions of what could have been considered as treatment for him are reliable. (Id. at 14.)

As the Court explained above, Dr. Schulman's Opinions 2 and 3 stating other treatments are available for narcolepsy are reliable given his training, and Opinion 4 is also reliable based on his background and experience treating narcolepsy patients; however, the Court finds Opinions 5-7 are more in depth and require more analysis.

In Opinion 5, Dr. Schulman disagrees with Dr. McCall's statement that Plaintiff was on the maximal therapy for his diagnosis. (Doc. 82-1, at 9.) In Opinion 6, Dr. Schulman opines that transitioning to different formulations of the medications Plaintiff was on would have been possible to modify his treatments. (Id.) And in Opinion 7, he states there were additional medications that could have been tried and have been shown to benefit some patients. (Id.) Dr. Schulman points out that the medications might not have worked for Plaintiff, but it would have been appropriate to try one or both before concluding

no additional therapy was available. (Id.) While Dr. Schulman reviewed Plaintiff's medical records from visits with Dr. McCall and the Longstreet Clinic, as well as the polysomnography results from testing in April 2017, he never himself examined Plaintiff. (See id. at 1.) Based on his lack of familiarity with Plaintiff as a patient and weak explanation on how these various treatments would have changed Plaintiff's condition, the Court finds Opinions 5-7 to be unreliable. When a "witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Frazier, 387 F.3d at 1261 (quoting Fed. R. Evid. 702 advisory committee's notes (2000 amends.)). "The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted." Id. at 1262. While the Court took no issue with Dr. Schulman offering his opinion that other medications and treatments were available in Opinions 2-4, the Court finds Opinions 5-7 are too speculative to be reliable. Although Dr. Schulman has extensive training and experience treating narcolepsy patients, the Court finds it too hypothetical for him to opine on how Plaintiff's dosages of medication could have been changed, and how he could have been

treated differently even though Dr. McCall, his treating physician, stated he was at the maximum treatment for his diagnosis.  There very well could have been other treatments, as Dr. Schulman outline in his prior opinions, but to take it further and try and tell the jury Dr. McCall's observations were wrong and other combinations could have been tried on Plaintiff is not reliable because Dr. Schulman has not treated Plaintiff first-hand and does not tie in his hypothetical plans with anything from Plaintiff's medical records.  If Dr. Schulman went through what he found in the medical records to indicate how these other medications might be beneficial based on various statistics, then the Court would be less hesitant to let him express his opinions; however, he provides no connection as to why these medications might have worked for Plaintiff beyond the fact that additional treatments and varying dosages existed. Based on this, the Court finds Opinions 5-7 are too speculative to be reliable in this case and therefore they shall be excluded.

    3. <u>Relevance</u>

    Finally, Defendant argues Dr. Schulman's Opinions 2-3 and 5-10 are irrelevant because Dr. McCall's treatment of Plaintiff or any alleged conflict of interest has no bearing upon the causes of action in this lawsuit.  (Doc. 82, at 14.)  It argues Dr. Schulman's opinions about Dr. McCall's alleged conflict of interest are nothing more than what lawyers could argue during

closing arguments. (Id.) Furthermore, it believes these opinions are more prejudicial than probative and should be excluded. (Id. at 14-15.) In response, Plaintiff argues these opinions are relevant because the issues surrounding Dr. McCall's treatment of Plaintiff centers around his failure to consider additional and alternative treatment options. (Doc. 88, at 14.) Further, he argues these failures show Dr. McCall had the same biases as the Department, and it speaks to the discriminatory biases of Dr. Meiler and Dr. Arthur. (Id. at 14-15.)

The only opinions remaining pursuant to Defendant's argument here are Opinions 2, 3, 8, and 10. The Court, based on its analysis above, finds Opinions 2 and 3 to be relevant. Since Dr. Schulman is qualified to give these opinions about additional treatments existing, the Court finds this testimony concerns information that would assist an average lay person in evaluating the case. Turning to Opinions 8 and 10, the Court previously found Dr. Schulman qualified to offer his opinion on medical ethics in this capacity. In terms of relevancy, Defendant is concerned these opinions are more prejudicial than probative. (Doc. 82, at 14.) In response, Plaintiff argues this testimony is more probative than prejudicial because it can be used to prove essential elements of his claim, namely whether Defendant acted with bias in its actions. (Doc. 88, at 18.) Since the Court has found Dr. Schulman qualified to testify

about his information, and Defendant has not set forth explicit justification for prejudice other than the information being potentially misleading, the Court will allow Opinions 8 and 10 to be admitted. The jury's job is to determine credibility and it will be able to do so with regards to these opinions. Based on the foregoing, Defendant's motion to exclude (Doc. 82) is **GRANTED IN PART** and **DENIED IN PART**.

### III. MOTION FOR SUMMARY JUDGMENT

Defendant moves for summary judgment on Plaintiff's claims. (Doc. 83.) Defendant argues Plaintiff's disability discrimination claims fail because he cannot establish a *prima facie* case or point to evidence that Defendant's reasons for allegedly disparate terms and conditions of his employment and not renewing his residency contract were a pretext for intentional discrimination. (Doc. 83-1, at 3.) Further, it argues Plaintiff cannot show Defendant failed to provide him a reasonable accommodation. (Id.) In response, Plaintiff argues there is direct and circumstantial evidence from which a jury could find discriminatory intent, and there is evidence from which it is possible a jury could find he was a qualified individual. (Doc. 89-1, at 7, 21.) Furthermore, he asserts summary judgment should not be granted on the accommodation claim as it relates to his transfer request. (Id. at 32.) The Court address the Parties' arguments below.

## A. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, a motion for summary judgment is granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'material' if . . . it might affect the outcome of the case . . . [and it] is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259-60 (11th Cir. 2004) (citations omitted). The Court must view factual disputes in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [the non-moving party's] favor." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted). The Court should not weigh the evidence or determine credibility. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586 (citations omitted). A mere "scintilla" of evidence, or simply conclusory allegations, will not suffice. See e.g., Tidwell v. Carter Prods., 135 F.3d 1422, 1425 (11th Cir. 1998).

Defendant here does not bear the burden of proof at trial, and therefore may "satisfy its initial burden on summary judgment in either of two ways." McQueen v. Wells Fargo Home Mortg., 955 F. Supp. 2d 1256, 1262 (N.D. Ala. 2013) (citing Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-16 (11th Cir. 1993)). First, Defendant "may simply show that there is an absence of evidence to support [Plaintiff's] case on the particular issue at hand." Id. (citation omitted). If this occurs, Plaintiff "must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. (citation omitted). Or second, Defendant may "provide affirmative evidence demonstrating that [Plaintiff] will be unable to prove [his] case at trial." Id. (citation omitted and alterations in original).

"Parties may not, by the simple expedient of dumping a mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions." Preis v. Lexington Ins. Co., 508 F. Supp. 2d 1061, 1068 (S.D. Ala. 2007). Essentially, the Court has no duty "to distill every potential argument that could be made based upon the materials before it on summary judgment." Id. (citing Resol. Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir.

1995)).   Accordingly, the Court will only review the materials the Parties specifically cite and legal arguments they expressly advance.  See id.

In this action, the Clerk of Court provided Plaintiff notice of the summary judgment motion, the right to file affidavits or other materials in opposition, and the consequences of default.  (Doc. 84.)  For that reason, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied.  Plaintiff responded to the motion (Doc. 89), Defendant replied in support (Doc. 95), Plaintiff filed a sur-reply in opposition (Doc. 99), and Defendant filed a sur-reply in support (Doc. 102).  The time for filing materials has expired, the issues have been thoroughly briefed, and the motion is now ripe for consideration.  In reaching its conclusions herein, the Court has evaluated the Parties' briefs, other submissions, and the evidentiary record in the case.

**B. Rehab Act, 29 U.S.C. § 794, et seq. Legal Standard**

The Rehab Act prohibits entities receiving federal funds from discriminating against an "otherwise qualified individual with a disability . . . solely by reason of her or his disability." 29 U.S.C. § 794(a).  "The standard for determining liability under the [Rehab Act] is the same as that under the Americans with Disabilities Act ["ADA"]. . . ; thus, cases involving the ADA are precedent for those involving the [Rehab

Act]." Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005) (internal citations omitted). To make out a *prima facie* discrimination claim under the Rehab Act requires Plaintiff prove: "(1) []he had a disability; (2) []he was otherwise qualified for the position; and (3) []he was subjected to unlawful discrimination as the result of [his] disability." Garrett v. Univ. of Ala. at Birmingham Bd. of Trs., 507 F.3d 1306, 1310 (11th Cir. 2007) (citation omitted). Unlawful discrimination can occur when an employer "fails to provide a reasonable accommodation" to an otherwise qualified person "unless doing so would impose an undue hardship on the employer." Boyle v. City of Pell City, 866 F.3d 1280, 1289 (11th Cir. 2017) (citation omitted). A reasonable accommodation enables an employee with a disability "to perform the essential functions" of his position or "to enjoy equal benefits and privileges of employment as are enjoyed by its similarly situated employees without disabilities." 29 C.F.R. § 1630.2(o)(1)(ii), (iii). An employer can satisfy its reasonable accommodation requirements under the Rehab Act by: (1) providing a reasonable accommodation; or (2) by engaging with the employee in an interactive process to determine a reasonable accommodation even though no accommodation is ultimately provided because either (a) there is a breakdown in the process not due to the employer or (b) there is no reasonable way to accommodate the employee. See Stewart v. Happy Herman's

Cheshire Bridge, Inc., 117 F.3d 1278, 1286-87 (11th Cir. 1997) (granting summary judgment for employer when employer engaged in interactive process and offering five accommodations, but plaintiff rejected them and demanded a different accommodation); Bell v. Westrock Servs., Inc., No. 15-0148, 2016 WL 3406117, at *9 (S.D. Ala. June 17, 2016) (finding no failure to accommodate when employer "made efforts to accommodate" employee).

## C. Discussion

Defendant moves for summary judgment on Plaintiff's claims, arguing he cannot meet his burden of proving a *prima facie* case of discrimination because he cannot show he is an otherwise "qualified individual" or that he was subjected to unlawful discrimination "solely by reason of his discrimination." (Doc. 83-1, at 4-5.) Further, it argues Plaintiff's failure to accommodate claim fails because he was responsible for the breakdown in the process, any requests were untimely and not required, any request to transfer to new a residency was not reasonable or required, and his after-the-fact requested accommodation to finish residency without night call would cause an undue hardship. (Id. at 24-31.) The Court will address each component individually. It first notes that there is no dispute Plaintiff had a disability, so the Court need not address the first prong necessary to prove a Rehab Act claim.

1. <u>Qualified Individual</u>

First, Defendant argues "Plaintiff could not perform the essential functions of an anesthesiology resident and posed a risk to patient safety, [therefore,] he was not otherwise qualified for the position." (Doc. 83-1, at 6.) It argues two of the essential functions of being an anesthesiology resident are the ability to be on time and the ability to take overnight call, and Plaintiff was unable to do either of these things. (<u>Id.</u> at 6-10.) In response, Plaintiff argues there is evidence from which it is *possible* a jury could find Plaintiff was a qualified individual. (Doc. 89-1, at 21.) He argues "[t]he determination of whether someone is a qualified individual, what the requirements for the program are, and whether someone is a 'direct threat' are all questions of fact." (<u>Id.</u> (citations omitted).) Plaintiff argues that due to the evidence of discriminatory bias, there are sufficient facts from which a jury *could* find Plaintiff was qualified for the position with or without accommodations. (<u>Id.</u> at 21-22.)

To establish a Rehab Act discrimination claim, "plaintiff bears the burden of proving that [he] is a 'qualified individual with a disability' — that is, a person who, with or without reasonable accommodation, can perform the essential functions of [his] job without jeopardizing patient safety." <u>Leme v. S. Baptist Hosp. of Fla., Inc.</u>, 248 F. Supp. 3d 1319, 1341 (M.D. Fla. 2017) (quoting <u>Cleveland v. Policy Mgmt. Sys. Corp.</u>, 526

U.S.  795,  806,  (1999))  (internal  quotations  omitted).
Typically,  the  first  step  of  the  analysis  requires  the  Court
determine  whether  Plaintiff  has  the  position's  prerequisites,
such  as  sufficient  experience,  educational  background,  and
things  of  the  sort.  Id. at 1342.  However,  there  is  no  dispute
in  this  case  that  Plaintiff's  background  qualified  him  into  the
anesthesiology  residency  program;  instead,  the  only  question  is
whether  he  can  perform  the  essential  functions  of  the  job.  See
id.  "Essential  functions  are  the  fundamental  job  duties  of  a
position  that  an  individual  with  a  disability  is  actually
required  to  perform,  as  distinct  from  mere  marginal  functions."
Id. (citing  Holly v. Clairson Indus., L.L.C., 492  F.3d  1247,
1257  (11th  Cir.  2007)).  "Whether  a  function  is  essential  is
evaluated  on  a  case-by-case  basis  by  examining  a  number  of
factors."  Holly, 492  F.3d  at  1258  (citing  D'Angelo v. ConAgra
Foods, Inc., 422  F.3d  1220,  1230  (11th  Cir.  2005)).  The  factors
include  but  are  not  limited  to:  consideration  to  the  employer's
judgment  as  to  what  functions  of  the  job  are  essential,  written
descriptions  of  the  job  advertised  or  used  when  interviewing
applicants,  amount  of  time  spent  on  the  job  performing  the
function,  consequences  of  not  requiring  employee  to  perform  the
function,  work  experience  of  past  employees,  and  the  current
work  experience  of  employees  in  similar  positions.  D'Angelo,
422  F.3d  at  1230  (citations  omitted).

In this case, Dr. Arthur compiled a list of essential functions to use in evaluating Plaintiff by relying on her resources from the ABA and the ACGME – two governing bodies. (Doc. 83-2, at 27; Doc. 74, at 159.)   Dr. Arthur did not rely on the job description in this instance because it comes from the business office and is mostly related to an attending, not a resident, so she instead based her essential functions on the ABA competencies.  (Doc. 83-2, at 27; Doc. 74, at 165.)   Among the essential functions Dr. Arthur compiled for an anesthesiology resident were:

> **DAILY RESPONSIBILITIES:** Residents are required to arrive in the hospital no later than 6:30 am each day (6:00 am on the cardiothoracic rotation) to set up their work area, operating room (OR), or block area before the start of the day.   Residents should complete their [operating room] setup and patient interviews by 7:00 am (or by 6:30 am on the cardiothoracic rotation).
> **ON CALL ACTIVITIES:** The objective of on-call activities is to provide residents with continuity of patient care experiences throughout a 24-hour period, provided the resident is a CA-1 or higher.   In-house call is defined as duty hours beyond the normal workday when residents are required to be immediately available in the assigned institution.
> Continuous on-site duty, including in-house call, not to exceed 24 consecutive hours (PGY-2 and above).

(Doc. 83-7, at 27; Doc. 89-3, at 50.)   Upon reviewing these essential functions, on December 6, 2017, Dr. McCall, as Plaintiff's treating physician, certified Plaintiff should be able to accomplish the essential functions of an anesthesiology resident.  (Doc. 89-2, at 31.)   However, after Dr. McCall met with Dr. Meiler and Dr. Arthur on January 3, 2018, he decided to

46

withdraw his signature from approving Plaintiff. (Id. at 32.) He removed his signature because he found out from Dr. Meiler and Dr. Arthur about Plaintiff's performance issues, specifically that he could not show up on time to residency – he did not remove his approval due to Plaintiff's medical condition. (Doc. 75, at 145, 147-148; Doc. 89-2, at 32.)   Dr. McCall explained that part of Plaintiff's performance issues could have been due to his narcolepsy, however there was no way to know how much could be attributed to the diagnosis. (Doc. 75, at 148.) Plaintiff admits Dr. McCall withdrew his signature from the essential functions document, but he disagrees with Defendant's characterization that he was unqualified to perform the essential functions of an anesthesiology resident. (Doc. 89-3, at 51.)

The Court first looks at the evidence of the essential functions for an anesthesiology resident, focusing primarily on arriving on time and overnight call.   As to Plaintiff's tardiness, Defendant argues that even prior to his narcolepsy diagnosis, Dr. Arthur received complaints about Plaintiff from faculty and senior residents regarding his tardiness. (Doc. 83-2, at 13.)   Plaintiff admits faculty and senior residents contacted Dr. Arthur about his performance, and that prior to his medical leave he was late three times; however, he disputes that his performance was poor and argues he never committed a medical error resulting in an injury to a patient. (Doc. 89-3,

at 24-25.)   Ultimately, Plaintiff disputes he was late with the consistency Defendant claims but does not deny being late on at least three occasions prior to his diagnosis.   (Id. at 25.)   The Parties agree residents are told from the beginning of residency how important it is to always be on time, both at the start of shift and returning from breaks.   (Id. at 7.)   Furthermore, Plaintiff knew first year residents were expected to be at work no later than 6:30 AM each day (and earlier if on cardiothoracic rotation) and have their operating room set up and have completed patient interviews by 7:00 AM.   (Id.)   Plaintiff also admits an anesthesiologist being late can have ramifications to patient safety, can have operational consequences, and can negatively affect the efficiency of a procedure.   (Id. at 9, 11, 13.)

Using the factors set forth above, the Court finds there is no genuine dispute of material fact that being on time is an essential function of being an anesthesiology resident. Plaintiff states he "disputes" the contention he was not qualified to perform the essential functions of his residency based on all the evidence about his timeliness; however, he agrees with all the components that qualify arriving on time as an essential function of the position, and therefore the Court finds his "dispute" self-serving and only for the purpose of trying to defeat this claim.   (See e.g. id. at 6, 7 9, 10.)   The record is filled with evidence demonstrating the importance of

being on time as a resident, and no reasonable juror could determine arriving on time is not an essential function of this position.    Furthermore, being on time for any job is an essential function because not being at work prevents an employee from performing *any* job functions, essential or otherwise.   See Jackson v. Veterans Admin., 22 F.3d 277, 279 (citations omitted).   Having made this determination, the Court now examines whether Plaintiff is a qualified individual, meaning whether with or without reasonable accommodation, he can perform this essential function of his job without jeopardizing patient safety.   See Leme, 248 F. Supp. 3d at 1341 (finding that one who does not come to work cannot perform *any* of his job functions, essential or otherwise) (citations omitted).

The undisputed evidence shows that before his narcolepsy diagnosis, Plaintiff arrived late to work at least three times. (Doc. 89-3, at 24, 25.)   After his diagnosis and his return from medical leave, Defendant alleges Plaintiff was late for the start of his shift at least sixteen times, returned late from lunch break at least four times, and called out sick at least five times.   (Id. at 47.)   Plaintiff again disputes the frequency of his tardiness, but admits he was late at most four times during this period.   (Id.)   Nevertheless, Plaintiff admits he showed up late at least seven times, both before and after his medical leave.    Further, Plaintiff admits that an anesthesiologist being late can have ramifications on patient

safety.  (Id. at 9.)  While Plaintiff disputes the frequency of his tardiness, he does not dispute that he was placed on a remediation plan due to his unsatisfactory performance, including his tardiness.  (Id. at 30-32.)  This further supports the Court's finding that being on time is an essential function of the job and that Plaintiff was failing to fulfill it, because the Department clearly was concerned with this and was taking steps to try and rectify the situation.

Based on Plaintiff's inability to show up on time on at least seven occasions, both before and after his narcolepsy diagnosis, he failed to fulfill one of the essential functions of his residency.  Additionally, because being late can have ramifications on patient safety, the facts also support the conclusion that Plaintiff posed a threat to the health and safety of others when he was tardy.  See Todd v. Fayette Cnty. Sch. Dist., 998 F.3d 1203, 1216 n.9 (11th Cir. 2021) ("The 'direct threat' defense relates to whether the employee is a qualified individual - prong two of the prima facie case - because it focuses on whether the plaintiff can perform the essential functions of [his] job." (citation omitted)); see also Leme, 248 F. Supp. 3d at 1346 ("In a medical setting, the ability to ensure patient safety is, inherently, a component of every essential function of the job." (quoting Collis v. Gwinnett Cnty., 156 F. Supp. 2d 1342, 1345 (N.D. Ga. 2001)).)

Although the Parties agree Plaintiff never committed a medical error resulting in injury to a patient, that is not enough to overcome the evidence that he often *posed* a threat to the health and safety of his patients by being tardy. (See Doc. 89-3, at 9, 53.)   The Rehab Act does not require employers to wait until a perceived treat becomes real or results in injury. Allmond v. Akal Sec., Inc., 558 F.3d 1312, 1317 n.7 (11th Cir. 2009) (quoting Watson v. City of Miami Beach, 177 F.3d 932, 935 (11th Cir. 1999)).   Furthermore, based on Plaintiff's status in residency, he was constantly under supervision by a senior resident and attending faculty member and they were able to ensure patient safety even if mistakes were to arise. (Doc. 83-1, at 12.)   Nevertheless, the evidence proves Plaintiff was unqualified to perform the essential functions of his job because he could not consistently show up on time.  Despite the dispute about how many times he was actually late, the failure to be timely on at least the seven admitted occasions posed a threat to the health and safety of patients, further making him unqualified for his position.   Based on the Court's determination that Plaintiff was not an otherwise qualified individual, it will not analyze the other listed essential function of taking overnight call.  While the Court's analysis could stop here, out of an abundance of caution, it will also address Defendant's arguments regarding prong three of a Rehab Act claim: whether Plaintiff has proven he was subjected to

unlawful discrimination as the result of his disability.   See Garrett, 507 F.3d at 1310.

### 2. Disability Discrimination

Defendant argues that even if Plaintiff was a qualified individual, he was not subjected to unlawful discrimination because of his disability, and even if he could name a proper comparator, which he cannot, it would not be enough to salvage his claim because he cannot show Defendant took any action against him *solely* based on his narcolepsy diagnosis.   (Doc. 83-1, at 14-15.)   Plaintiff argues there is evidence from which a jury could find discriminatory intent.   (Doc. 89-1, at 7.) Specifically, he argues there is direct evidence that decision makers viewed his diagnosis with narcolepsy as making him ineligible to continue in residency, the decision makers created an evaluation process with discriminatory intent and outcome, there were inconsistent standards during his evaluation process, Defendant failed to accommodate his request for naps, there were unfair restrictions in his work and discriminatory comments made by co-workers and decision makers, and Defendant dismissed him and refused to transfer him based on his disability.   (Id. at 7-20.)

For a *prima facie* discrimination claim under the Rehab Act, Plaintiff must prove he had a disability, was otherwise qualified, and finally, that he was subjected to unlawful discrimination because of his disability.   See Garrett, 507 F.3d

at 1310.   This can be proven with direct or circumstantial evidence.   *Todd*, 998 F.3d at 1214.   "[D]irect evidence is evidence that 'if believed, proves the existence of fact without inference or presumption.'"   *Id.* at 1215 (quoting *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1156 (11th Cir. 2020)).   "Only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination."   *Id.*   On the other hand, "evidence that merely suggests, but does not prove, a discriminatory motive is not direct evidence."   *Id.* (citations and quotation marks omitted).

Defendant moves for summary judgment on the premise that Plaintiff has failed to show it took any action against him solely based on his narcolepsy diagnosis.   (Doc. 83-1, at 15.) Plaintiff argues there is direct evidence of discrimination, specifically through the decision makers' views that Plaintiff's narcolepsy diagnosis made him ineligible to continue residency. (Doc. 89-1, at 7.)   However, even if the decision makers did have these thoughts, it only suggests, but does not prove, a discriminatory motive, which is insufficient to qualify as direct evidence.   See *Todd*, 998 F.3d at 1215.   Plaintiff himself alleges that the decision makers' concerns arose because he could be a "big liability" which does not support his direct evidence theory, but instead goes to show Plaintiff is using circumstantial evidence to try and prove his claim.   (*See* Doc.

89-1, at 2.)   Ultimately, the Court finds Plaintiff failed to meet his burden of alleging direct evidence of discrimination. When there is a lack of direct evidence of discrimination, a claim must be analyzed under the burden shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).

Under McDonnell Douglas, a plaintiff establishes a prima facie case of disability discrimination by showing "(1) he ha[d] a disability (2) he [was] otherwise qualified for the position; and (3) he was subjected to unlawful discrimination as the result of his disability." Sutton v. Lader, 185 F.3d 1203, 1207 (11th Cir. 1999) (citation omitted).   Doing so creates a rebuttable presumption that the employer acted illegally. See McDonnell Douglas, 411 U.S. at 802.   "The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the [termination]." Id.   The employer's burden is an "exceedingly light" one of production, not persuasion, which means the employer "need only produce evidence that could allow a rational fact finder to conclude that [the plaintiff's] discharge was not made for a discriminatory reason." Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1331 (11th Cir. 1998), abrogated on other grounds by Thomas v. Esterle, No. 21-10638, 2022 WL 2441562 (11th Cir. July 5, 2022); Meeks v. Comput. Assocs. Int'l, 15 F.3d 1013, 1019 (11th Cir. 1994) (quoting Miranda v. B & B Cash Grocery Store,

Inc., 975 F.2d 1518, 1529 (11th Cir. 1992)).   If the employer
meets this burden, the burden shifts back to the plaintiff who
can only avoid summary judgment by presenting "significantly
probative" evidence that the proffered reasons are pretextual.
Young v. Gen. Foods Corp., 840 F.2d 825, 829 (11th Cir. 1988).[4]

Using this standard, the Court will assume *arguendo* that
Plaintiff has shown evidence of Defendant's discrimination and
turn to address whether Defendant articulated a legitimate,
nondiscriminatory reason for the termination.   Defendant put
forth numerous reasons for the actions taken against Plaintiff,
arguing it clearly had a legitimate, non-discriminatory reason
for terminating him.   (Doc. 83-1, at 22.)   First, it cites to
"numerous and ongoing documented complaints of Plaintiff's
continued unprofessionalism, chronic tardiness, lack of
preparedness, unreliability, and risk to patient safety."   (Id.)
Then, it references complaints of Plaintiff's performance it
received both before and after his narcolepsy diagnosis from
various sources which "guided and served as the basis for all
actions taken against Plaintiff, including his ultimate contract
non-renewal."   (Doc. 95, at 7.)   Further, it cites to Plaintiff

---

[4] Plaintiff argues for a different standard to be used in employment
discrimination cases, arguing he only needs to "cast sufficient doubt"
regarding the Defendant's proffered reasons.   (Doc. 89-1, at 5 (citing Combs
v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1996).)   However,
Plaintiff's argument fails to address the entire case, which further provides
that a plaintiff must demonstrate "such weaknesses, implausibilities,
inconsistencies, incoherencies, or contradictions to the employer's proffered
legitimate reasons for its action that a reasonable factfinder could find
them unworthy of credence."   Combs, 106 F.3d at 1538.   The Court finds this
description consistent with the standard it employs by using the McDonnell
Douglas framework.

admitting to the truthfulness of several of the received complaints, and additional evidence that his performance issues were discussed with him on numerous occasions throughout his residency. (Id. (citing Doc. 80, at 134:31-136:16).) Defendant relies on all of this evidence, as well as the evidence of Plaintiff's remediation plan, which was implemented before his narcolepsy diagnosis, and in which he was warned that if another serious complaint was lodged against him, it would be permissible grounds for dismissal. (Id. at 8.) Since Defendant has an exceedingly light burden to articulate a legitimate, nondiscriminatory reason for its action, the Court finds it has satisfied its burden of showing Plaintiff's discharge was not made for a discriminatory reason.[5] Therefore, the Court turns back to Plaintiff to determine whether he can provide "significantly probative" evidence that the proffered reasons are pretextual. See Young, 840 F.2d at 829.

"It is not enough for a plaintiff to demonstrate that an adverse employment action was based partly on his disability. Rather, under the [Rehab Act], a plaintiff must prove that he suffered an adverse employment action 'solely by reason of' his handicap." Ellis, 432 F.3d at 1326 (internal citations

---

[5] Plaintiff argues that, when viewing the evidence in the light most favorable to him, there is genuine dispute regarding whether Defendant was referring to his diagnosis or past performance. (Doc. 99, at 3.) However, the Court finds this to be without merit because the evidence clearly differentiates between issues before and after Plaintiff's diagnosis, and that the issues with Plaintiff during both time periods were legitimate and concerning.

omitted); _see also_ <u>Porterfield v. Soc. Sec. Admin.</u>, No. 20-10558, 2021 WL 3856035, at *4 (11th Cir. Aug. 30, 2021) ("The burden for establishing causation under the [Rehab Act] . . . requires proof that the individual was discriminated against 'solely by reason of her disability.'" (citation omitted).) Plaintiff argues there is sufficient evidence from which a jury could find the decision to terminate him was based solely on his diagnosis with narcolepsy. (Doc. 99, at 6.)  However, the undisputed facts prove that Plaintiff had numerous issues reported before he was ever diagnosed with narcolepsy, and this alone causes his discrimination claim to fail.  First, even at the start of his residency, some faculty and senior residents contacted Dr. Arthur about Plaintiff's performance. (Doc. 89-3, at 24.)   Additionally, he was given an overall clinical competence grade of unsatisfactory from July 1, 2016 through December 31, 2016, also before he was diagnosed with narcolepsy. (<u>Id.</u> at 28.)  The report found Plaintiff to be unsatisfactory in the areas of "demonstrates honesty, integrity, reliability, and responsibility," "learns from experience, knows limits" and "reacts to stressful situations in an appropriate manner." (<u>Id.</u>)  Furthermore, Plaintiff was placed on a remediation plan due to his unsatisfactory reports that were provided to the ABA, which alerted him to Defendant's concerns with his progress and made his aware he was falling behind in his program. (<u>See</u> Doc. 89-3, at 30-34.)  With this evidence in the record, the Court

finds it impossible for a fact finder to find Plaintiff was terminated *solely* because of his disability. Plaintiff disputes Defendant's characterization of his work at numerous points; however, he admits there were numerous complaints and that he was put on remediation due to his unsatisfactory performance, again illustrating that even if he disagreed with the findings, they were still made by Defendant, and this took place before he was diagnosed with narcolepsy. (See id.) Based on all of this, Plaintiff has failed to prove that he was an otherwise qualified individual or that he was subjected to unlawful discrimination *solely* because of his disability; therefore, his claim for disability discrimination under the Rehab Act fails.

"Summary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an essential element of its case, and on which it bears the burden of proof at trial." Leme, 248 F. Supp. 3d at 1340 (citation omitted). Plaintiff bears the burden of proving the three elements required for a discrimination claim under the Rehab Act and he has failed to do so. Furthermore, under McDonnell Douglas, Plaintiff failed to present "significantly probative" evidence that Defendant's proffered reasons are pretextual. Young, 840 F.2d at 829. Therefore, Defendant is entitled to summary judgment on Plaintiff's disability discrimination claim.

### 3. Failure to Accommodate

Finally, Defendant moves for summary judgment on Plaintiff's failure to accommodate claim, and argues that even if Plaintiff was a qualified individual, he was responsible for the breakdown in the accommodation process, his alleged requests were untimely and not required, any request to transfer to new residency was not reasonable or required, and his after-the-fact requested accommodation to finish residency without night call is not required because it would cause an undue hardship. (Doc. 83-1, at 24-31.) In response, Plaintiff argues he requested a transfer to another residency program while still in the residency program, the request was not for a promotion, he discussed the transfer with Dr. Arthur, and she failed to make it happen. (Doc. 89-1, at 32-34.)

"The plaintiff bears the burden of identifying a reasonable accommodation – that is, an accommodation that enables him to perform the 'essential functions' of his position." Goldberg v. Fla. Int'l Univ., 838 F. App'x 487, 492 (11th Cir. 2020) (citation omitted). Plaintiff's Complaint only alleges Defendant refused to accommodate his request to transfer to another residency program. (Doc. 50, at 12.) Therefore, the Court turns to Defendant's arguments regarding Plaintiff's request to transfer, specifically that his request was untimely and unspecific. (Doc. 83-1, at 27.) Defendant admits there were discussions upon Plaintiff's return from medical leave

about helping him transfer to a different program.   (Doc. 80, 268:18-269:13.)   However, Plaintiff represents it was not until after the decision not to renew his residency contract was made that he actually requested a transfer to another program.   (Id. 268:4-17.)

"[T]he duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made."   Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363 (11th Cir. 1999).   Furthermore, as Defendant correctly argues, "[a]n employer generally is not required to grant a request for reasonable accommodation after the occurrence of workplace misconduct that warrants . . . termination."   Alvarez v. Sch. Bd. of Broward Cnty., 208 F. Supp. 3d 1281, 1286 (S.D. Fla. 2016); (Doc. 83-1, at 28).   An "employee must show that he requested a reasonable accommodation while on the job . . . but the employer simply refused to make that accommodation, thereby discriminating against the employee at the time."   Fussell v. Ga. Ports Auth., 906 F. Supp. 1561, 1570 (S.D. Ga. 1995).   This Court has explained that "[w]ithout this requirement the employee could casually mention a claimed disability, say nothing, wait to be terminated, then think up new suggested accommodations years later while in the midst of [Rehab Act] litigation."   Id.   Plaintiff himself admits he did not make a request for transfer until after the Department decided to terminate him; however, he argues he "was still on

the job and in the residency program" because his contract did not end until a few months later.   (Doc. 89-1, at 33.)   While the Court agrees that Plaintiff was still "on the job" when he made the request, his request was still made after the occurrence of workplace misconduct that caused termination, making it untimely under the Alvarez standard, causing his claim to fail.   Nevertheless, out of an abundance of caution, the Court will address the Parties' additional arguments.

As explained above, the initial burden is on Plaintiff to make a sufficiently specific request – it does not require magic words but must be definite enough the employer is aware of the condition and the desired accommodation.   Laun v. Bd. of Regents of Univ. Sys. of Georgia, No. CV 118-033, 2019 WL 4694940, at *9 (S.D. Ga. Sept. 25, 2019) (citation omitted).   Plaintiff and Defendant disagree about whether or not he specifically requested a transfer to the internal medicine residency.   (Doc. 89-3, at 40.)   But regardless of that fact, Defendant asserts any request to be transferred was not reasonable or required. (Doc. 83-1, at 29.)   It argues that since the residency programs are all different and have different criteria, any new program would have to agree to accept the resident transfer and the Department had no power or authority to force a different program to accept Plaintiff.   (Id.)   Defendant asserts that Plaintiff would have had to take steps on his own, including applying and interviewing, to be accepted into another program

and that was not something it could do for him. (Id. at 29-30.)
Defendant admits there is no formal process for requesting a
transfer but compares the situation to another former resident,
M.W., who expressed a desire to transfer, worked with the new
program to apply, interview, and eventually effectuate a
transfer when the program agreed to accept him. (Id. at 30.)
Defendant argues in this instance Plaintiff took no action on
his own, which made the request impossible and unattainable.
(Id.) Plaintiff disputes this contention, arguing it was not
his fault, but that a reasonable jury could find he requested a
transfer and Dr. Arthur failed to facilitate the transfer.
(Doc. 89-1, at 34.) However, Plaintiff's argument is not
legally sound or factually supported, because even accepting as
true that he timely requested a transfer into the internal
medicine residency, there is no evidence, or even any
suggestion, that the anesthesiology department could
automatically make that happen simply by his request. The Rehab
Act "imposes no requirement upon an educational institution to
lower or to effect substantial modifications of standards to
accommodate a handicapped person." J.A.M. v. Nova Se. Univ.,
Inc., 646 F. App'x 921, 926 (11th Cir. 2016) (quoting Se. Cmty.
Coll. v. Davis, 442 U.S. 397, 413 (1979)). Based on these
findings, the Court finds Plaintiff has failed to put forth
evidence sufficient to successfully prove that Defendant failed
to accommodate him, because his request was untimely, and there

are no avenues for transfer that he put forth or are factually possible that could have just made his transfer successful without work of his own. Defendant's arguments point to a lack of evidence in Plaintiff's claim and demonstrate he would be unable to prove his claim at trial; therefore, Defendant is entitled to summary judgment on Plaintiff's request to accommodate claim.

## IV. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendant's motion to exclude (Doc. 82) is **GRANTED IN PART** and **DENIED IN PART** and Defendant's motion for summary judgment (Doc. 83) is **GRANTED**. The Clerk is **DIRECTED** to **ENTER JUDGMENT** in favor of Defendant, **TERMINATE** all other pending motions, if any, and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia, this 20th day of March, 2023.

J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA